**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARJUNA NATURAL PVT. LTD. f/k/a ARJUNA NATURAL EXTRACTS LTD., a foreign corporation, | |
| Plaintiff, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| OROCHEM TECHNOLOGIES, INC., an Illinois corporation | |
| Defendant. | |

## INTRODUCTION

1. Plaintiff Arjuna Natural Pvt. Ltd., formerly known as Arjuna Natural Extracts Ltd. ("Arjuna"), is a manufacturer of omega-3 products that it sells to businesses that use omega-3 as an ingredient in finished products to sell to end-consumers. As part of its manufacturing process, Arjuna must purify omega-3 derived from raw ingredients such as fish oils.

2. Defendant Orochem Technologies, Inc. holds itself out to the public, including to potential customers, as an expert in manufacturing and providing Simulated Moving Bed ("SMB") chromatography equipment and services to companies that use this equipment in their businesses. *See* https://orochem.com/product-category/chromatography/ (last visited Jan. 20, 2020).

3. In 2015 and 2016, Orochem fraudulently induced Arjuna into purchasing from Orochem an SMB unit for use in purifying omega-3 oils, for which Arjuna paid Orochem $1,350,000. Although Orochem delivered the SMB unit to Arjuna's factory, the SMB unit never functioned to the promised purification levels. Orochem knew, while inducing Arjuna to purchase the SMB unit, that the SMB unit it would ultimately and did deliver would not and could not function as Orochem represented it would. Arjuna could not and did not discover Orochem's fraud

until December 2016, when Arjuna technicians learned that the SMB unit did not purify omega-3s to the promised purity level. At around that time, Arjuna informed Orochem that the SMB unit was not functioning and that the pumps Orochem used in the SMB unit had failed, the rotary valve in the SMB unit experienced slippages, and the size of the pipes was too small to purify omega-3s to the level promised by Orochem. Over the next several months, Orochem repeatedly promised Arjuna that it would remedy the problems and fix the SMB unit so that it would function at a level of 200 metric tons per annum ("MTA") at 90% purity. Relying on Orochem's promises, Arjuna spent substantial time and money working with Orochem to remedy the problems, but the SMB unit never functioned at the level promised by Orochem. Finally, after several months of working with Orochem without success, Arjuna told Orochem that the SMB unit was not functioning and demanded that Orochem remove the SMB unit and refund its money. To date, Orochem has not removed the SMB unit or refunded Arjuna's money.

4. The SMB unit has not only never functioned to the required and promised specifications, but it has, for the last three years, occupied valuable factory floor space in Arjuna's factory that has, in turn, precluded Arjuna from purchasing and using a functional SMB unit and fulfill contracts to its own customers. Without a functional SMB unit, Arjuna has been unable to purify omega-3 oils to fulfill business contracts, has lost business opportunities, and has lost business goodwill.

5. Accordingly, Arjuna seeks at least $15,000,000 in damages caused by Orochem's fraud and the other misconduct alleged herein.

## **PARTIES**

6. Plaintiff Arjuna is a foreign corporation with its principal place of business in India.

7.      Defendant Orochem is an Illinois corporation with its principal place of business in Illinois, located at 340 Shuman Blvd., Naperville, Illinois 60563.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff and defendant are completely diverse as citizens of a foreign state and a state, and the amount in controversy exceeds the sum or value of $75,000 exclusive of interests and costs. Plaintiff Arjuna is a foreign corporation with its principal place of business in India.  Defendant Orochem is an Illinois corporation with its principal place of business in Illinois, located at 340 Shuman Blvd., Naperville, Illinois 60563.

9.      This Court has personal jurisdiction over the defendant because it resides and does business in this judicial district.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the defendant resides in this district.

## FACTUAL BACKGROUND

11.     Arjuna manufacturers omega-3 products and purifies the omega-3 oils for use in final form as part of the manufacturing process.  It sells purified omega-3 oils to businesses who use the omega-3 as an ingredient in finished products to sell to end-consumers.

12.     To manufacture omega-3 oils to sell to its customers, Arjuna must purify omega-3 oils from raw ingredients such as fish oils.

13.     Orochem claims it specializes in Simulated Moving Bed ("SMB") chromatography equipment and services.  Orochem advertises its expertise in SMB chromatography equipment to its potential customers online including at https://orochem.com/product-category/simulated-

moving-bed-chromatography/, at trade conferences, and in oral and written communications with its potential customers.

14.     Individuals from Arjuna learned of Orochem when individuals at Orochem reached out to Arjuna about potentially purchasing SMB equipment from Orochem for Arjuna's use in purifying omega-3 fish oil to sell to Arjuna's business customers.

15.     Throughout 2014 and 2015, individuals from Orochem, including Orochem's President and Chief Executive Officer Dr. Asha Oroskar and Owner Dr. Anil Oroskar, represented to individuals at Arjuna, including Arjuna's Executive Director Antony Kunjachan and Arjuna's Joint Managing Director Benny Antony, that Orochem had significant expertise in commercial SMB units, and that it could and would use this expertise to provide and install a commercial SMB unit for Arjuna's use in purifying its omega-3 products.

16.     In oral and written communications, Dr. Asha Oroskar and Dr. Anil Oroskar represented to Mr. Kunjachan and Dr. Antony from Arjuna that Orochem could and would deliver a commercial-grade SMB unit that would be fully functional with the ability of purifying omega-3 oils at a level of 200 metric tons per annum ("MTA") at 90% purity.

17.     In addition, Orochem, through Dr. Asha Oroskar and Dr. Anil Oroskar, represented to Mr. Kunjachan and Dr. Antony from Arjuna that the SMB unit would result in significant output of omega-3, and promised that Arjuna would make a specific amount of profit based upon the output of the SMB unit Orochem promised to deliver.

18.     On about September 28, 2015, Dr. Asha Oroskar or Dr. Anil Oroskar (or both), on Orochem's behalf, submitted a proposal to Arjuna for the sale of a commercial SMB chromatography unit that could purify omega-3 products at a scale of 200 MTA at 90% purity.

19.    In the proposal, one or both Dr. Asha Oroskar and Dr. Anil Oroskar represented that Orochem specialized in SMB chromatography equipment and services for the pharmaceutical and nutraceutical industry around the world.

20.    The proposal included Orochem's description of the SMB unit it would deliver and stated that Orochem would supply installation, inspection, start-up supervision and training onsite. The description stated that the SMB unit that Orochem would deliver constituted a commercial-grade SMB unit that would purify omega-3 oils at a level of 200 MTA at 90% purity. Nothing in the proposal stated that Orochem would provide a pilot SMB unit, that the SMB unit would not be able to purify omega-3 oils at a level of 200 MTA at 90% purity, or that Orochem would take over two years to deliver a commercial SMB unit meeting these specifications.

21.    On around March 14, 2016, Dr. Anil Oroskar from Orochem met with the Arjuna board of directors to explain the principles of SMB operations and to answer questions. Dr. Oroskar represented that the capacity of the supplied SMB unit would be 200 MTA with a feed rate of 110 kg/hr, and that the SMB unit would be ready for start-up by the end of June 2016.

22.    At the time that Orochem made these representations to Arjuna about the SMB unit's capacity, Orochem knew that the SMB unit it provided to Arjuna could not and would not be able to purify omega-3 oils at a level of 200 MTA at 90% purity and knew that the SMB unit was not commercial-grade but was a pilot SMB unit that could not perform at the specifications that Orochem promised.

23.    Arjuna relied on Orochem's outward representations to Arjuna's detriment by paying Orochem $1,350,000; paying over $1,100,000 in expenses in an attempt to make the SMB functional, including building a new factory to house the SMB unit, purchasing supporting equipment, conducting multiple trials on the SMB unit, modifying the SMB unit supplied by

Orochem at the request of Orochem engineers, and making space available Arjuna's factory that could have been used for a functioning SMB unit; and losing over $13,000,000 in profits and business opportunities that Arjuna could have received had Orochem not made fraudulent representations about the SMB unit.

24.     Orochem's misrepresentations to Arjuna were material to Arjuna's decision to pay money to Orochem and to take the actions Arjuna took in response to Orochem's representations. Relying on Orochem's false representations about the SMB unit's output capacity and functionality, Arjuna paid Orochem in exchange for Orochem delivering a commercial grade SMB unit that met Orochem's promised specifications.

25.     On about October 13, 2015 Arjuna paid 750,000 USD to Orochem and on May 19, 2016, Arjuna paid an additional 600,000 USD to Orochem for the SMB unit.

26.     On about July 21, 2016, Orochem delivered a physical SMB unit to Arjuna's factory in India.

27.     On about December 2, 2016, Orochem installed the SMB unit.

28.     Shortly after the installation, in December 2016, technicians engaged by Orochem and Arjuna learned that the purification levels and capacity were significantly less than the amount that Orochem had specified in the proposal and in Orochem's previous representations to Arjuna. In fact, when technicians engaged by Orochem and Arjuna tested the SMB unit, they determined that the SMB unit was nonfunctional and unusable for the purposes of purifying omega-3 oil.

29.     After the SMB unit was discovered to be unusable, in December 2016 and January 2017, Arjuna repeatedly contacted Orochem to inform Orochem of the nonconforming unit.  Dr. Asha Oroskar and Dr. Anil Oroskar from Orochem repeatedly promised, during in-person meetings, telephone calls, and emails, that Orochem would resolve the issues so that the unit was

functioning. Orochem promised that if Arjuna continued to store the SMB unit in its factory, engaged technicians to work with Orochem's technicians, and purchased various materials, Orochem would remedy the issues with the SMB unit so that the SMB unit would be functional and that could purify omega-3 products at a scale of 200 MTA at 90% purity.

30.     Over the next months, Orochem engaged technicians to attempt to fix the SMB unit so that it was functional and operated at the level promised by Orochem. Arjuna expended time and money engaging technicians and making modifications to the system as requested by Orochem in order to fix the SMB unit so that it operated at the specifications and capacity that Orochem repeatedly promised. Arjuna also continued to store the SMB unit in its factory, which prevented Arjuna from obtaining another SMB unit that was functional in purifying omega-3 oils.

31.     Despite giving Orochem ample time and many opportunities to bring the SMB unit into a conforming, functional state, Orochem failed to ever provide a functional SMB unit to Arjuna that purified omega-3 oils at a scale of 200 MTA to 90% purity.

32.     After learning that the SMB unit did not work as Orochem represented and promised, Arjuna conducted further investigation into the issue and discovered that Orochem had not delivered the "commercial grade" SMB unit it had promised, but rather had delivered a "pilot" SMB unit. Moreover, Arjuna learned that Orochem knew at the time it made representations to Arjuna about the quality and capabilities of the SMB unit, and prior to inducing Arjuna into purchasing the SMB unit, that the pilot SMB unit would not function at the promised purification levels.

33.     On around November 16, 2017, Arjuna informed Orochem that the SMB unit was not functioning and did not meet the specifications promised by Orochem, and demanded that Orochem rectify the system so that it operated at the capacity that Orochem previously represented.

7

Shortly thereafter, Orochem agreed to replace the valves, piping, and columns with higher capacity versions which would theoretically bring the SMB unit into functioning condition.

34.     Between November 2017 and January 2018, Arjuna again worked with Orochem technicians and continued to expend money on technicians and on running trials of the SMB unit to generate data to be given for Orochem to redesign the system which would provide 200 MT of 90% Omega 3 as promised in the initial proposal.  It also continued to store the nonfunctioning SMB unit in its factory.

35.     On around November 9, 2018, during an in-person meeting at the Supply Side West Show in Las Vegas, Nevada and in a telephone conversation, Orochem agreed to remove the SMB unit from Arjuna's facilities and refund the amounts Arjuna had paid for the SMB unit.

36.     Over the months since November 9, 2018, up to and including December 2019, Orochem has repeatedly stated that it will remove the SMB unit and refund Arjuna for the amounts that it paid to Orochem for the SMB unit.  However, to date, Orochem has failed to remove to the SMB unit and refund the money Arjuna paid for the unit.  The SMB unit has never operated to the specifications promised by Orochem prior to Arjuna purchasing the unit and has never been functional or usable for Arjuna's business purposes.

37.     The nonfunctional SMB unit currently sits in Arjuna's factory, where it is occupying valuable space that Arjuna needs to use for a functional purification unit so that it may continue with its business operations.  Arjuna cannot install a new unit or purify omega-3s until Orochem removes the SMB unit, which is causing Arjuna ongoing damages in the form of lost business.

## FIRST CLAIM FOR RELIEF
### (Fraud)

38.     Arjuna incorporates by reference all paragraphs of this complaint set forth above into this count.

39.     The fraudulent statements, misrepresentations, and omissions giving rise to this claim are set forth in detail above including Paragraphs 2, 3, 13-17, 21, 22.  In short, Orochem, through Drs. Oroskar and others, represented to Arjuna that it was an expert in the field of SMB chromatography equipment and services for the pharmaceutical and nutraceutical industry around the world.  Orochem further represented that it could and would provide a commercial grade SMB unit to Arjuna that would be able to purify omega-3 oils to 90% purity, at a scale of 200 MTA, with a feed rate of 110 kg/hr.  Orochem made these representations of fact despite knowing that they were false, and intending that these misrepresentations would induce Arjuna to purchase an SMB unit from it.

40.     These facts were material to Arjuna's decision to pay Orochem for the SMB unit, installing and storing the SMB unit, and planning its business.

41.     Relying on these fraudulent misrepresentations and reasonably believing the misrepresentations to be true, Arjuna purchased an SMB unit from Orochem, believing it to be of commercial grade and to possess the specifications promised by Orochem.

42.     Arjuna reasonably relied on Orochem's fraudulent misrepresentations to its detriment, including by paying $1,350,000 for a nonfunctional, pilot SMB unit, spending time and money trying to bring the nonfunctional pilot SMB unit into a functioning state, and experiencing lost business opportunities during the time that Arjuna could not provide 90% purified omega-3 oils due to the nonfunctional pilot SMB unit, the loss of goodwill and business reputation due to its inability to provide 90% purified omega-3 oils due to the nonfunctional pilot SMB unit, and

9

lost business opportunities due to the nonfunctional SMB unit taking up valuable factory floor space needed for a functional SMB unit.

43.     WHEREFORE, Arjuna seeks judgment in its factor and against Orochem for:

   a.     At least $15,000,000 in damages but in an amount to be proven at trial, including for damages resulting from the loss of goodwill, damages resulting from the loss of business relationships and opportunities, and lost profits;

   b.     Pre-judgment and post-judgment interest at the statutory rate;

   c.     Costs of suit; and

   d.     Such further relief as this Court may deem just and proper.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract in the Alternative)**

44.     Arjuna incorporates by reference paragraphs 1-37 of this complaint as set forth above into this count.

45.     Arjuna brings this breach of contract claim in the alternative to its claim for fraud.

46.     In around September 2015, Arjuna contracted with Orochem to purchase a functional, commercial SMB chromatography unit that could purify omega-3 products at a scale of 200 MTA at 90% purity.

47.     Arjuna paid Orochem $1,350,000 up front to purchase such an SMB unit.

48.     Arjuna spent $924,591 installing the SMB unit and $271,882 conducting trials in an attempt to make the SMB unit function to the promised levels.

49.     Orochem never delivered a functional, commercial SMB chromatography unit that could purify omega-3 products at a scale of 200 MTA at 90% purity and therefore breached the contract by delivering nonconforming goods.

50.     Despite being given ample opportunity to do so, Orochem to date has not cured the breach by delivering conforming goods.

51.     Arjuna has suffered damages as a consequence of Orochem's breach, including, but not limited to, capital expenses paid in an attempt to make functional the nonfunctioning SMB unit, loss of business opportunities, loss of goodwill, and loss of business reputation.

52.     Arjuna fulfilled all conditions precedent needed to maintain this breach of contract claim.

53.     The proposal referenced in paragraphs 18, 19, and 20 is not the contract as it was procured through fraud and because Arjuna did not agree to all of its terms.

54.     WHEREFORE, Arjuna seeks judgment in its favor and against Orochem for:

    a.    At least $1,350,000 in compensatory damages but in an amount to be proven at trial;

    b.    At least $14,000,000 in consequential damages stemming from the breach in an amount to be proven at trial;

    c.    Lost profits stemming from the breach in an amount to be proven at trial;

    d.    Pre-judgment and post-judgment interest at the statutory rate;

    e.    Costs of suit; and

    f.    Such further relief as this Court may deem just and proper.

### THIRD CLAIM FOR RELIEF
#### (Unjust Enrichment in the Alternative)

55.     Arjuna incorporates by reference paragraphs 1-37 of this complaint as set forth above into this count.

56.     Arjuna brings this unjust enrichment claim in the alternative to its breach of contract claim.

57.     Arjuna conferred on Orochem a benefit when Arjuna paid Orochem $1,350,000 for a functional, commercial SMB chromatography unit that could purify omega-3 products at a scale of 200 MTA at 90% purity.

58.     Instead of the commercial SMB unit it paid for, Arjuna only received a pilot SMB unit that could not function to the requisite levels as set forth in the proposal and negotiations between Arjuna and Orochem. This nonfunctioning pilot SMB unit has only been to Arjuna's detriment, as it paid $1,350,000 for a machine that does not function to its required standards, and Arjuna has had to house the nonfunctioning unit since 2016 in space needed for a functioning unit.

59.     Orochem was to deliver a functional, commercial SMB chromatography unit that could purify omega-3 products at a scale of 200 MTA at 90% purity and instead delivered a pilot SMB unit that could not perform to these standards.  Under the circumstances, it is against justice, equity and good conscience to permit Orochem to retain the benefits arising out of its sale of the pilot SMB unit to Arjuna.

60.     WHEREFORE, Arjuna seeks judgment in its favor and against Orochem for:

    a.     At least $1,350,000 in funds that it unlawfully obtained and retained;

    b.     Pre-judgments and post-judgment interest at the statutory rate;

    c.     Costs of suit; and

    d.     Such further relief at this Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment)

61.     Arjuna incorporates by reference paragraphs 1-37 of this complaint as set forth above into this count.

62.    A dispute has arisen between Arjuna and Orochem about their respective rights in connection with the proposal Orochem provided and any agreement arising thereunder that is ripe for judicial determination.

63.    Arjuna alleges that it is owed over $15,000,000.  Orochem, by contrast, claims that Arjuna is owed less than the amount demanded and seeks to claim that the proposal is the contract that governed the same of the SMB unit.

64.    Any agreement arising under the proposal sent by Orochem was procured through fraud.  Among other things, Orochem falsely and fraudulently represented that it could and would deliver a commercial-grade SMB unit that would be fully functional with the ability of purifying omega-3 oils at a level of 200 metric tons per annum ("MTA") at 90% purity; that the SMB unit would result in significant output of omega-3; and that Arjuna would make a specific amount of profit based upon the output of the SMB unit Orochem promised to deliver.  In addition, the agreement was procured through fraud because Orochem fraudulently omitted that Orochem would provide a pilot SMB unit, that the SMB unit would not be able to purify omega-3 oils at a level of 200 MTA at 90% purity, or that Orochem would take over two years to deliver a commercial SMB unit meeting these specifications.  Had Arjuna known the truth, Arjuna would not have paid Orochem anything and would not engaged in any business transaction with Orochem.

65.    In light of the above, an actual controversy has arisen as to whether the proposal referred to in paragraphs 18, 19, and 20 comprises the contract for Arjuna's purchase of the SMB unit from Orochem.  Further, if the proposal does comprise the contract then an actual controversy exists as to whether the proposal constitutes an enforceable contract and, if so, on what terms given

that Arjuna contends that it was procured through fraud and that parties did not act conformance with the proposal.

66.     WHEREFORE, Arjuna seeks a declaratory judgment stating as follows:

a.     That the proposal referenced paragraphs 18, 19, and 20 herein is not the contract governing Arjuna's purchase of the SMB unit; or, alternatively,

b.     That the proposal referenced paragraphs 18, 19, and 20 herein is not enforceable as a contract against Arjuna because Orochem procured it through fraud.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Arjuna demands trial by jury of all issues triable of right by a jury.

Dated: March 6, 2020                    Respectfully submitted,

Arjuna Natural Pvt. Ltd., f/k/a Arjuna
Natural Extracts Ltd, Plaintiff

_/s/ Saskia Nora Bryan_
_Local Counsel for Plaintiff_

LATIMER LEVAY FYOCK LLC
Saskia Nora Bryan, IARDC #6255682
Email:  sbryan@llflegal.com
55 W. Monroe St., Suite 1100
Chicago, Illinois 60603
Telephone: (312) 422-8000
Facsimile: (312) 422-8001

-and-

14

*Lead counsel for Plaintiff*
VENABLE LLP
Ari N. Rothman, USDC-Ill. Bar #90785518
600 Massachusetts Avenue N.W.
Washington, D.C. 20004
Telephone: 202-344-4000
Facsimile: 202-344-8300